NOURSE & BOWLES, LLP
Attorneys for Defendant
COMPANHIA SIDERÚRGICA NACIONAL
One Exchange Plaza
at 55 Broadway
New York, NY 10006-3030
(212) 952-6200 Telephone
(212) 952-0345 Facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAMPSKIBSSELSKABET NORDEN A/S,  :   **09 Civ. 565 (AKH)**
                                :   **ECF Case**
                Plaintiff,       :
                                :
    - against -                  :
                                :
COMPANHIA SIDERÚRGICA NACIONAL,  :
                                :
                Defendant.       :
                                :
------------------------------------------------------------X

# DEFENDANT'S MEMORANDUM OF LAW IN REPLY TO
## PLAINTIFF'S OPPOISITION TO DEFENDANT'S MOTION TO VACATE

Defendant, Companhia Siderúrgica Nacional (hereinafter referred to as "CSN" or "Defendant") by and through its counsel Nourse & Bowles, LLP respectfully submits this Memorandum of Law in Reply to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Vacate (hereinafter "Plaintiff's Opposition Memo").

## POINT I

### SUBSTITUTION OF BOND FOR AN EFT DOES NOT REMOVE THESE FACTS FROM THE PURVIEW OF SCI

A.  The Substitute Security was not "Voluntarily Posted" and is not different than the EFT

The bond was not "voluntarily posted" as Plaintiff states (Opposition Memo, p. 7). Plaintiff did not politely ask CSN to post the bond. CSN did not do so voluntarily. Plaintiff used the full power of a Court ordered Attachment Order to attach CSN's EFTs. CSN then voluntarily posted the bond ". . .AS SUBSTITUTE SECURITY FOR SUPPLEMENTAL ADMIRALTY RULE B MARITIME ATTACHMENT . . ." (Declaration of Corey R. Greenwald, Ex. G).

The definition of "substitute" found in Black's Law Dictionary, Revised Fourth Edition is "that which stands in lieu of something else". Plainly, the bond posted in this matter stands in lieu of the EFT. The bond is nothing more and nothing less then the EFT. It is not something new. Plaintiff obtained nothing more or less via the bond than it had via the EFT. The same is true for the Defendant.

This is echoed and plainly evident in the language of the bond which is quoted in our letter brief to Your Honor of November 18. The bond states that it is provided by

CSN with ". . . the right to assert any defenses or rights in respect of the validity of the January 21, 2009 Ex Parte Order of Attachment . . . [and] without prejudice to any rights, claims, or defenses . . . none of which shall be deemed to have been waived by the provision of this Bond" (Decl. of Corey R. Greenwald, Ex. G).

This is echoed in the Stipulation and Order Approving Surety Bond and Releasing Funds Under Attachment signed by the Court on March 18, 2009 which among other things states that the bond is posted "as substitute security" (Stipulation and Order, paragraph 3, Greenwald Decl., Ex. F) and that "nothing in the bond shall operate, or be construed as, affecting or limiting CSN's rights to seek relief within this action . . . as all of its rights are preserved". (Stipulation and Order, paragraph 6). Similarly, the Stipulation and Order provided that it was "without prejudice to any rights that Norden may now have or which Norden may have in the future, all of which rights are reserved . . ." (Stipulation and Order, paragraph 7).

Plaintiff gave no consideration and received no consideration in the substitution of the bond for the EFT. Plaintiff's naked statement that it gave consideration is just that. (Opposition Memo, p. 2) Naked. Moreover, the recitation of purported facts in Plaintiff's Opposition Memo (pages 2 and 5) are absolutely wrong.

Indeed, we believe that the entire last paragraph on page 2 of Plaintiff's Opposition Memo and many of their statements in the second paragraph on page 5 deal with another matter, <u>Asia Product Services Ltd v. Usha Martin Limited and Usha Martin Americans</u>, 09-Civ-5084 (WHP). Specifically, in the matter at Bar the Ex Parte Order and PMAG were <u>never</u> vacated. As is obvious from paragraph 3 of the Stipulation and

Order Approving Surety Bond Releasing Funds Under Attachment signed by the Court and filed on March 18 (not August 4), the bond was placed as <u>substitute security</u>, the maritime attachment of CSN's property in the hands of any and all garnishees in the proceedings were <u>dissolved</u> such that CSN's restrained property was <u>released</u> and no further attachment of CSN's property was permitted under the Ex Parte Order dated January 21, 2009. But, to repeat, the Ex Parte Order and PMAG were not vacated. Moreover, CSN did not agree to "voluntarily post new and different security for Plaintiff's claims in exchange for certain concessions from Plaintiff". (Opposition Memo, p. 2) To the best of our knowledge, there were no concessions whatever. The Ex Parte Order and PMAG dated January 21 were not vacated and dissolved by consent of the parties on August 4 as counsel for Plaintiff states. Those events appear to have happened in the above referenced <u>Asia Product</u> matter as can be seen from an Order signed by Judge Pauley on August 4. (Greenwald Reply Decl., Ex. N)

Moreover, to the best of our knowledge, the Ex Parte Order of Attachment dated January 21, 2009 and the PMAG have never been vacated.

The facts in this matter are in marked distinction to the facts in the <u>Europa Maritime v. Maganese Transalantic Corporation</u>, 08-Civ-9523 (DAB) (November 10, 2009) decision submitted by counsel for Plaintiff (Murphy Decl., Ex. 3). Of particular significance, in the <u>Europa</u> case, "Valuable consideration in the form of Plaintiff's ability to secure a larger claim was waived for the precise purpose of being able to obtain the security presently in place". Plaintiff in the case at Bar did not forego any further attachment and did not give any such <u>Europa</u> consideration. To the contrary, Plaintiff

-4-

obtained an attachment of the entire amount of its claim, "hit" those funds and then obtained the substitute security bond for that full amount. Moreover, in the case at Bar, Plaintiff obtained the right to assert additional claims on account of which it could obtain additional attachments (Greenwald Declaration, Ex. F, ¶ 7). Plaintiff did not forego any right or give any consideration in order to get the Bond.

The bond is not a creature of contract and no contract was created. The bond is nothing more than a replacement/substitute in the form of the security. All else remains unchanged.

The Second Circuit's decision in SCI banned the attachment of EFTs at an intermediary bank. It follows that since Orders allowing such attachments are being vacated and attached EFTs are being released, that all substitute security posted as the result of such (wrongful) attachments should also be released. This logic is strongly entrenched and applied in the fields of criminal and evidence law as the "Fruit of the Poisonous Tree" doctrine.

The "Fruit of the Poisonous Tree" doctrine dictates that evidence which is otherwise admissible but discovered as a result of an earlier violation is excluded as tainted. Wong Sun v. United States, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). By analogy, the poisonous tree is the attachment of EFTs at an intermediary bank. The fruit of that tree, in this case, is the bond which was posted solely because of such (unlawful) attachment. Therefore, the bond is "tainted" as it would have never been posted but for the unlawful attachment. While we are aware that the legal precedents in criminal and evidence law have no precedential effect in this action we trust that the

Court will see the logic of this analogy and be persuaded to order that the two bonds posted be released.

It is also respectfully noted that "but for" the attachment of the EFT, the substitute security, in the form of the bond would never have come into being. It would, therefore, be entirely inequitable, and a perversion of the retroactivity rule of <u>Hawknet, Ltd. v. Overseas Shipping Agencies</u>, No. 09-2128-cv (2d Cir. Nov. 17, 2009) for the outcome of the motion now before the Court to be different because Defendant placed a bond as "substitute security" in lieu of an attached EFT.

B.  The EFTs Did not Change Character and Become Attachable Nor Were They Reattached

[1]Plaintiff argues in Section I(B) of its Opposition Memo that the EFTs initially attached changed their nature post attachment, and were validly reattached. The Plaintiff is implying that once an EFT is attached and placed into a segregated account it is somehow transmogrified and becomes subject to Rule B attachment. The argument is contrary to <u>SCI</u> as well as to decisions of other Judges of this Court and New York state court decisions. The cases cited by Plaintiff do not support the proposition.

This is not the first time that Plaintiff's counsel has made this argument and it will not be the first time that it will be pointed out to this Court that this same argument was rejected by another Judge of this Court. (Zaslowsky Reply Memorandum, p. 6) This is disappointing. Plaintiff's counsel argued to Judge Castel that the actual attachment of an EFT, placement of funds into a suspense account, and subsequent second service of the

---

[1] Portions of the arguments from this Section have been adopted and/or cut and pasted from Baker & McKenzie LLP's Reply Memorandum in Case No. 07 Civ. 9913. Express permission was received from David Zaslowsky, Partner of Baker & McKenzie LLP.

attachment order made those funds something other than an EFT removing them from the SCI decision. (See Greenwald Reply Decl., Ex. J). Judge Castel rejected the argument stating that "attachment is an equitable remedy. The so-called 'funds' attached were an EFT at the time of attachment. It would be inequitable to permit plaintiff to continue to restrain funds that originated with an attachment of an EFT." (See Ex. J).

Judge Gardephe agreed with Judge Castel and stated:

> I was troubled by the reservice because given the fact that the attachment here was based on an electronic funds transfer, I understand that it may have been converted to cash at this point or a sum of money. But in my judgment, given the nature of this remedy consistent with Judge Castel's comments, would find it inequitable to restrain the funds on the argument that, well, now their monies because they have been converted to monies even though the attachment was based on electronic funds transfer, we now know under Jaldhi that the attachment never should have been granted or it never should have been exercised as to EFTs and for me to permit those funds that were improperly attached to be kept now on the theory that they have been converted into cash as a result of the attachment to me would be completely inequitable and would not be an appropriate use of what is an equity remedy.

(See Greenwald Reply Decl., Ex. K)

Judge Koeltl has again and more recently spoken on this issue and stated:

> [T]he fact that the funds are no longer in transit does not remove this case from the scope of Jaldhi. The fact remains that there was no property of the defendant that could have been attached in the first instance. No alchemy by the bank transformed EFTs that cannot be attached into property of the defendant that can be attached.

(See Greenwald Reply Decl., Ex. M)

The cases Plaintiff cites, <u>Maersk</u> and <u>Good Challenger</u>, to support the argument that the funds can be reattached again in their new character are actually pre-SCI cases.

Moreover, they are factually distinguishable and simply contrary to the above decisions of the Judges within the District. Further, we understand that the Transfield case cited by Plaintiff (Memo p. 9) did not have a Motion pending and, is thus, equally distinguishable.

Plaintiff's argument is also inconsistent with state court decisions. In the Bank of N.Y. v. Norilsk Nickel, 14 A.D.3d 140, 145-146, 789 N.Y.S.2d 95, 99 (1st Dept. 2004), an EFT originated by Genex was frozen at Bank of New York under OFAC regulations. When the regulations expired, creditors of Genex sought to attach the funds by serving process. Under Plaintiff's argument, once Bank of New York froze the EFT and put funds in its OFAC suspense account, that should have operated to transmogrify the funds from an EFT to some other form of property that was subject to attachment when the second service was made by Genex's creditors. Were there merit to that argument, then the Court would have held that Genex's creditors had the right to attach those funds. But the Court held that they did not.

Plaintiff also ignores that the Second Circuit was presented with and sub silentio rejected in SCI a similar argument that the voluntary movement of funds changed their character and allowed them to become subject to attachment. In SCI, the EFTs of which the defendant was the beneficiary were attached on multiple days in accordance with the usual practice of daily service of the attachment order. The defendant later agreed to voluntarily deposit the attached funds into the court registry. (Greenwald Reply Decl., Ex. L) As such, if Plaintiff's argument with respect to the change in nature of the attached funds had any merit, then the Second Circuit in SCI would have allowed the attached funds in SCI to remain in the Court's Registry. Instead, the Second Circuit

- 8 -

released those funds from the Court's Registry just as the Court in this case should release the bond.

Plaintiff also argues that even if the SCI analysis applies then it has validly reattached those funds. However, if there was any such reattachment (which Defendant denies) then Plaintiff has failed to provide the mandatory "prompt notice" of such attachment to Defendant as required by Local rule of the SDNY, Rule B.2. Any such reattachment should thus be vacated.

## POINT II

## THE ATTACHED FUNDS DID NOT BELONG TO DEFENDANT

Plaintiff's Opposition Memorandum repeatedly states that CSN has "admitted" or "stated" that it was the owner of the attached funds to support its argument that Plaintiff's attachments were proper. However, in making those arguments, Plaintiff ignores that all such statements by CSN were made long before SCI was decided and, as such, based on the "then – prevailing" Winter Storm state of the law. Accordingly, all such CSN statements were accurate when they were made. However, they are now simply wrong and a nullity in terms of SCI.

The EFTs were attached in the hands of an intermediary bank. As such, SCI is applicable and requires that the attachment and substitute security be released.

## POINT III
## DEFENDANT SHOULD NOT BE ESTOPPED FROM ITS DEFENSES

Plaintiff's arguments that Defendant must be estopped from seeking return of the funds originally attached – now held as a bond – are grounded upon erroneous interpretations of the relevant law and should be disregarded in their entirety

First and foremost, Plaintiff fails to recognize that the retroactive application of SCI, which is mandated by the Second Circuit's Hawknet decision, renders the original attachment of CSN's EFTs void *ab initio*. The mere fact that a bond was substituted for the invalidly attached funds does not cure the original jurisdictional defect that mandates dismissal of this action and release of the bond. Thus, this Court can never reach any of the equitable estoppel arguments asserted.

Second, even assuming *arguendo* that this Court has jurisdiction in the first instance to consider whether CSN may be estopped from seeking release of the bond, Plaintiff's estoppel arguments should be disregarded. They constitute nothing more than a repeat of the same old equitable "reliance" arguments made in Chevron v. Huson, which were discredited by the Supreme Court's later decisions in Harper and Reynoldsville Casket. It is clear that this Court may no longer avoid the retroactive application of a new rule of law (SCI) based upon mere reliance or other equitable considerations.

Moreover, Plaintiff has not demonstrated the essential elements for equitable estoppel in the first instance. As noted in its Opposition Memo, in order to succeed, the Plaintiff must show: (1) that there was a concealment or false representation; (2) an

intention that the other party rely thereon; (3) knowledge of the true facts; and (4) detrimental reliance. In this case, the Plaintiff cannot show that there was a "concealment or false representation" because CSN reserved all of its defenses to the original attachment at the time the bond was posted and it never represented or implied that it would not seek release of those funds.

Further, it is impossible for Plaintiff to demonstrate "reliance" upon the posting of the bond by CSN. While Plaintiff ceased to serve further Rule B writs on the banks seeking additional EFTs, it was fully secured on the then – existing law. Once the decision in SCI was rendered, Plaintiff had no right to the funds caught in the original attachment and no reliance interest in having foresworn further illegal attachments. Even if Plaintiff had caught further funds, those would now be subject to orders of release from this Court.

Plaintiff gets no support for its arguments from the pre-SCI decision in Pagane Maritime Ltd. v. Glingrow Holding Ltd, *slip op.* 07 cv 10726, 2008 U.S. Dist. Lexis 7016 (Jan. 30, 2008 S.D.N.Y.). That opinion is thoroughly inapposite as, in that case, there was a clear misrepresentation of fact by the defendant which induced the plaintiff to cease serving the PMAG writ on the banks. In the current matter, the SCI decision completely vitiates any reliance interest claimed by Plaintiff. The remaining cases cited by Plaintiff are simply inapplicable as they offer no guidance on whether a "reliance" or "estoppel" exception to the SCI ruling is appropriate.

# POINT IV

## GARNISHEE ACTION IRRELEVANT

There is no validity to Plaintiff's argument that the garnishee bank "voluntarily" complied with the PMAG writ and, therefore, under the New York UCC, the improperly attached funds may continue to be restrained. See <u>Palestine Monetary Authority v. Strachman</u>, 873 N.Y.S.2d 281 (1st Dept. 2009)(hereinafter "<u>PMA</u>" decision). The citation to the <u>PMA</u> decision, upon which Plaintiff bases this argument, is incomplete and the language left out of the quote at page 12 of Plaintiffs's Opposition Memorandum was critical to the Appellate Division's conclusion in that case and is determinative of the issues in this case. While Plaintiff correctly states that <u>PMA</u> held that the UCC gives an intermediary bank the right to ignore process served upon it, Plaintiff fails to note that the Appellate Division considered it decisive that the process served upon the bank in <u>PMA</u> *did not seek restraint of wire transfers specifically* but was, instead, a generically worded information subpoena:

> Thus, neither the state restraining notice nor the federal injunction specifically restrained fund transfers, nor enjoined a specific fund transfer or transfers from completion. Neither injunction was aimed at the particular fund transfers that were subsequently restrained. Clearly, the word "transfer" in the injunction and state restraining notice is not used in the same way as in the term of art, "wire-fund transfer." The BNY sought no relief with regard to the injunctions. Consequently, we do not find that the order by which BNY restrained the funds was improper or a violation of UCC 4-A-503.
>
> <u>PMA</u> at 291.

Clearly, had the information subpoena or federal restraining notice issued in <u>PMA</u> contained language seeking the restraint of wire transfers at the intermediary bank, that notice would have been improper and a violation of New York law. This distinction is important as the PMAG served in this action specifically sought the restraint of wire transfers at the intermediary bank. As a practical matter, the whole purpose of serving the PMAG upon banks in New York was to restrain wire transfers of absent defendants, like CSN, at the intermediary banks. The restraint of a wire transfer at an intermediary bank was always invalid under New York law and the adoption of this principle by the Second Circuit in <u>SCI</u> makes those restraints invalid as a matter of federal maritime law as well.

Significantly, the Plaintiff also ignores the Appellate Division's discussion of which party has a "property interest" in a wire transfer when those funds are at an intermediary bank. That analysis is entirely consistent with the Second Circuit's decision in <u>SCI</u> and concludes that the intermediary bank is the "owner" of the funds being transferred at that brief moment.[2]

On the issue of ownership, PMA is entirely consistent with Jahldi's holding that neither the originator nor the beneficiary of an EFT has an ownership interest in the EFT at an intermediary bank. Thus, the First Department quoted from one of its earlier decisions in which it held:

---

[2] Portions of the arguments from this Section have been adopted and/or cut and pasted from Baker & McKenzie LLP's Reply Memorandum in Case No. 07 Civ. 9913. Express permission was received from David Zaslowsky, Partner of Baker & McKenzie LLP.

> Neither the originator who initiates the payment nor the beneficiary who receives it holds title to the funds in the account at the correspondent bank.[3]

The First Department also quoted from the Official Comment to the UCC as follows:

> "A creditor of the originator can levy on the account of the originator in the originator's bank before the funds transfer is initiated" but "[t]he creditor of the originator cannot reach any other funds because no property of the originator is being transferred."[4]

The First Department's holding also relied on its earlier decision in <u>Bank of N.Y. v. Norilsk Nickel</u>, 14 A.D.2d 140, 145-146, 789 N.Y.S.2d 95, 99 (1st Dept. 2004). That case involved an EFT in which Genex (a Serbian company) originated the EFT with its bank in order to pay Norilsk (a Russian company), the beneficiary. The EFT was restrained at Bank of New York ("BNY"), the intermediary bank, pursuant to OFAC regulations. When the funds were released ten years later, two creditors of Genex served process on BNY to attach the funds. BNY sought interpleader relief against the two creditors and Norilsk. The court "applied UCC 4-A and found that title had passed from Genex when [Genex's bank] adopted Genex's payment orders and executed them by transmitting the payment orders to the BNY."[5] In other words, Genex did not have a property interest in the EFT that had been attached at BNY and, therefore, its creditors could not attach the funds that had been frozen there.

---

[3] PMA, 873 N.Y.S.2d 281, 293 (citing Sigmoil Resources v. Pan Ocean Oil Corp. (Nigeria), 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept. 1996) lv. dismissed, 89 N.Y.2d 1030, 658 N.Y.S.2d 245 (1997)
[4] PMA, , 873 N.Y.S.2d 281, 293 (citing McKinney's Cons. Laws of N.Y. Book 62 ½, Uniform Commercial Code 4-A-502, Official Comment at 683-684).
[5] PMA, 873 N.Y.S.2d 281, 291 (citing Bank of N.Y. v. Norilsk Nickel, 14 A.D. 3d 140, 145-46, 789 N.Y.S.2d 95, 99 (1st Dept. 2004).

The "fly in the ointment" in PMA was a set of allegations of alter-ego and control among various Palestinian entities, including the alleged originator of the EFTs (PMA) and the alleged originating bank (PIB). For example, there was evidence that PIB was an "agent" of PMA and other evidence that PMA had "assumed control" over PIB.[6] Thus, discovery was necessary to sort out the precise relationship among the entities.[7]

Here, there is nothing like that. CSN was merely an originator of EFTs for commercial purposes. The decisions in SCI, PMA and Norilsk all support the conclusion that the funds attached in this case were not the "defendant's property" and therefore not subject to attachment under Rule B.

In short, the PMA decision fails to offer Plaintiff any support, and a proper reading of the Court's analysis compels the conclusion that funds restrained pursuant to an improper order must be released.

## POINT VI
## THE COURT LACKS JURISDICTION

The critical question is one of jurisdiction. SCI held that *quasi in rem* jurisdiction cannot be acquired over a defendant by attaching an EFT in which the defendant is either the originator or the beneficiary because the EFT is not the defendant's property. Since the Court cannot acquire *quasi in rem* jurisdiction over a defendant by the attachment of such an EFT, the Court cannot thereafter acquire jurisdiction when the original attachment was improper and failed to provide the court with *quasi in rem* jurisdiction. Therefore, since the bond was posted under the mistaken belief that *quasi in rem* jurisdiction existed over the *res*, the bond should be released. "It has been held by the

---

[6] PMA, 873 N.Y.S.2d 281, 293-294.
[7] PMA, 873 N.Y.S.2d 281, 294.

United States Supreme Court on a number of occasions that the bond is a substitute for the *res*, so that in any given case the court can exercise as much authority over it as if the vessel itself were in the custody of the court, but no more." J.K. Welding Co. Inc. v. Gatham Marine Corp., 47 F.2d 332 (S.D.N.Y. 1931) (emphasis added, citations omitted). This principle is equally true in a Rule B proceeding as in a Rule C proceeding.

As such, the Plaintiff's citation to Transportes Navieros at Opposition Memo, p. 18 has no application.

## CONCLUSION

The Order of Attachment should be dismissed, the substitute security bond should be released and the action dismissed.

Dated: New York, New York
November 20, 2009

                                       NOURSE & BOWLES, LLP
                                       Attorneys for Defendant
                                       Companhia Siderúrgica Nacional

                                       By: _____
                                            John P. Vayda
                                            One Exchange Place
                                            At 55 Broadway
                                            New York, New York 10006
                                            (212) 952-6200

Of Counsel
Corey R. Greenwald, Esq.
Julia M. Moore, Esq.

To:    Lennon, Murphy & Lennon, LLC
        Anne C. LeVasseur, Esq.
        Charles E. Murphy, Esq.
        The Gray Bar Building
        420 Lexington Avenue
        New York, New York 10170
        (212) 490-6050
        Attorneys for Plaintiff
        Dampskibsselskabet Norden A/S